Charles Sevilla on behalf of the Petitioner George Wenzel and I'd like to argue our Miranda issue which has to be seen of course through the prism of EDPA. And the first question is whether there was a ruling that was contrary to or an unreasonable application of the holding in Miranda which states that if a defendant states in any manner that he does not wish to be interrogated, the police may not question him. And it goes on to say, the mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering further questions. And a big Kennedy. Kennedy. Isn't the question really, though, whether he asserted the Miranda rights in language and position, that the interrogating officers had no question but what they had to enforce Miranda? Well, that's one question. That's the first question. The second question is, where did he waive the right? There is absolutely nothing in this record where he says he waived the right. And Miranda goes on to say at 475 Well, I did get a written, they got a written waiver from him at the beginning, didn't they? At some point I think it's an acknowledgment of the rights An acknowledgment Not the waiver, because they're asking him to make the waiver and he doesn't do it. And Well, an oral waiver is good enough. Well, that's true. Absolutely. And so we have on Well, let's assume for the sake of your argument that he did, he was properly admonished prior to the interview beginning. Can you, I have the same problem, the same question Judge Beezer does. We have a determination by the California courts that the invocation of the right to remain silent was equivocal. As you point out, we review that determination under the deferential lens of AEDPA. How is that determination objectively unreasonable? Well, I think that when one examines the way the California Court of Appeal balkanized the examination into taking each question and answer and saying, well, this could have meant something, this could have meant, this could have been equivocal, this could have been equivocal But they did say that they, I mean, they looked at the video recording as I did and then concluded after examining the entire video recording that it was equivocal and that he actually continued voluntarily to answer questions. And the problem that creates for us is under AEDPA, how can we declare that that mixed question of law and fact is both clearly erroneous as a matter of fact and objectively unreasonable under Supreme Court precedent? Well, if one looks at page four of tab D where he comes into the room, he's given them a note and they are saying, well, the note's pretty brief. And he says, well, didn't you just say I could be silent if I wanted to? And they say, yeah. And he says, yeah. And then they say, so you don't want to talk to us? And he shakes his head, no. That's pretty unequivocal. But then it goes on to say, well, you know, we've got a lot of questions for you. We've got to, this is, I'm quoting from, as I said, D4, which is also excerpted in Respondent's Brief, page 17. And then they go on to ask him questions. And he says, maybe I'll talk to you later. I don't want to talk right now. How reasonable is it to say, for the Court of Appeal to say, well, we're going to take each one of those questions and his responses. And they parse it out and say, well, that could be. Where does he say, I assert my right to remain silent, terminate the questioning? He absolutely does not have to say that. Miranda is clear. If he says to the police in any case, I do not wish to be interrogated. Now, when he says, I don't want to talk right now, after he has said several times in advance of that, he doesn't want to talk either by shaking his head or nodding when they say, so you don't want to talk to us? He says, he actually shakes his head and says no. Mr. Savella, the California courts and I think the Federal District Court seem to think that we ought to consider as well, under the totality of the circumstances, the fact that your client voluntarily presented himself to the homicide unit and tendered a written note that perhaps not fully confesses, but pretty clearly implicates himself as having some role in it. Without a doubt. And so that the detectives could consider that along with what's on the video recording in determining whether or not he really wanted to continue answering questions. Well, they're wrong. And they're wrong by this. They're wrong, but you can't consider the fact that he volunteered? You can consider it, but Miranda covers that situation. At page 445, it says, the fact that he's volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries. So he comes in, gives the note, and in context, he's saying, it's all right there. When they say, we want to talk to you about it. And then he goes into the invocation on D4. I have a question straight up, straight down. What effect should we give to the finding of fact made by the California court? None, in your opinion? No, that you have to, you have to, no, you have to find it in order to, for my claim to prevail, to find it manifestly or objectively unreasonable. And so I'm saying when you I must make a finding 180 degrees away from the state court, right? I think that would qualify as objectively unreasonable. And so if you, if you look at the document, it's there in black and white. You've got Miranda saying, if he invokes in any way, it's an invocation. And the fact that he has previously said something or volunteered a statement is not relevant to his right to invoke. Do the cases recognize the same principle that we are familiar with in consent-to-search cases where a defendant can control the scope of the interview by refusing to answer questions on some topics but agreeing to answer questions on another? Well, that may be the case that he may be. I don't know the answer to that question. I don't know either. I don't think it happened here. I think he's pretty clear. Well, the reason I ask the question, and I'm sure you can understand where I'm coming from, is at the point where you say he unambiguously invoked his right to remain silent, the detectives then start asking him to fill out paperwork and answer questions with regard to his wife's medical condition and where they can go to get information on that condition from the hospital and the doctor. And my question is, even assuming that he was invoking his right to remain silent as to his role in her death, could he nonetheless, by continuing to answer those questions, have controlled the scope of the interview in such a way that it would not be a violation of Miranda if he agreed to answer those questions? Well, he's not controlling anything when he's invoking, and they continue saying, well, we need to talk to you. We've got to ask these questions. It's not his control. He didn't say, I'm not answering any more questions. We're done. Put me in the holding cell and go do whatever it is you have to do. Well, he doesn't have to be that explicit, and the cases are pretty clear. He wouldn't be here if he had done that, right? That's true. That's true. I mean, the whole issue here is the ambiguity of what he said and did. I just find it hard to say that it's ambiguous when he says that basically he doesn't want to talk to them, and I don't want to talk to you right now. I might agree with you if we were reviewing this on direct review from a federal conviction. The problem I have, and I think you and I have had this conversation before, is there is obviously a difference in the way we review these state determinations under AEDPA, and I might agree with you if we were looking at it on direct review, but it does make a difference that we're doing this under AEDPA. And one of the things that's important in assessing this question is the context of the full conversation. You don't balkanize. I know I read a case a couple of weeks ago out of this court where the defendant in the context of an interrogation says, I take the fifth on that, and the majority of that panel said, well, in context, looking at everything that preceded, that was really not an invocation. And that's what I'm saying. You look at in context, and when you look at all of those statements he made seriatim and ending with, I don't want to talk now, maybe I'll talk to you later, that's an invocation. And then the second point is, the second part of the problem is that the California courts, if we were to believe what they said, said that they looked at the context by viewing the tape and so on, and they made a determination which you are arguing to us is objectively unreasonable. Yes. And in essence, inviting us to revisit the mixed question of law and fact under AEDPA. Well, I think it's really, well, it is a mixed question of law and fact, but let's take it this way. Let's say the defendant said, under Miranda, which is cited 436 U.S. 445, I am invoking my right to counsel and my right to remain silent. Now, if the California court said that was ambiguous in some way, would this court have any problem saying that's an unreasonable determination of the fact? This judge would not. Okay. Well, I think we're dealing with that here. But I would also like to make this point, that after the, what I call the invocation, there was this interim point where there was some booking information taken. That was peppered with interrogative questions as well. There was no waiver. So it's your position that if they find that he has invoked and they cease the questioning, they can't even ask him questions related to the booking process? I think they could do that. But they couldn't pepper in questions like, well, was a weapon used in her death? Those are clearly Rhode Island DNS. But that gets back, now you're back to my scope question. Does the invocation relate to the narrow question of his role in the homicide? Or does he have the authority to control it in such a way that he chooses to voluntarily answer questions about who her doctor is and what hospital she went to without violating the Fourth Amendment? Well, I think the idea under Miranda is that if he does invoke, that's it. You don't get to ask even booking questions. You don't get to ask, well, you may be able to get real booking questions. Yeah. But you don't get to... As long as they don't relate to the subject. Yeah. You can't pepper in questions about her health, which is related to her death. One final point that I would like to make. Does that mean I'm one towards the end? I mean you're over, but you're committed to that. I noticed that the second hand wasn't going down. There was no waiver here. It's totally, I guess it's implied that at age, at page 14, that when he started talking in detail about the events of July 19, 1999, that that constituted some implicit waiver of rights. When in fact, Miranda says no waiver is presumed from silence of the defendant or that the defendant ultimately confessed at page 475. What's your response to the state court's determination that even if there was a technical Miranda violation here, the fact that he essentially admitted the same damaging facts to what his now wife and some family members essentially renders this entire question harmless error? Well the question at trial was whether this was a malicious killing. I mean he was acquitted of premeditation. There's an argument that of course in the uncertified issues about the judge not giving defenses that related to malice, but the issue was malice. It is hard to conceive of a confession that was detailed. Now there were some fragmentary statements that came in from relatives saying, yeah, he said he went up and helped put her to death. But the question was malice. Was it a malicious killing? And the details from the confession were significant in bringing in that verdict. And I think the topper on that is the judge. The judge during when the jury sent out a note said, we have a person here that is not convinced that Ms. Wenzel wasn't already dead at the time he came up. And the judge said in the middle of jury deliberations he gave an instruction. He said, ladies and gentlemen, I'm telling you that the evidence all points in the direction of her being alive when he went up there. You didn't clarify that issue, did we? No, but I'm pointing to the harmlessness issue. Because the judge relied on the defendant's statements to make that point. Now where did the statements came from? They came from of course the confession they just heard. The statements the defendant made on tape stating that she was alive and that he was weeping. The California court seemed to think that essentially he said the same thing to the other witnesses that he said to the detectives. I guess we can look at the record to see whether there's a variance between. One of the witnesses, his brother, said, when asked about. I read. I think we read all of it. I think we understand. You know, then we get on harmlessness. You're out of time. Thank you very much. All right. Thank you. I'll let you run over four minutes. We'll hear now from the state. May it please the court. Charles Ragland, Deputy Attorney General for Respondent at FLE Warden Early. The Supreme Court in the Miranda decision stated that nothing in that decision was designed to prevent a person from walking into a police station and confessing to a crime. And that's exactly what happened in this case. He walked into the police station with a note confessing to killing his wife and asking to speak to a homicide detective. The state court looked at the totality of the circumstances, including that highly significant event in determining that his statements were equivocal and ambiguous as to whether he wanted to speak. Now, following up on Your Honor's question, I believe Michigan v. Mosley does address the question of whether a defendant or suspect has a right to control questioning. And in that case, they discussed that the power to cease questioning is the way that a defendant can go about that. And that's what happened in this case. When he stated, I don't want to talk right now, maybe I'll talk to you later, he was essentially controlling the situation. He had already presented them with the note confessing to killing his wife, but he didn't at that moment want to talk about it any further. They dealt with non-Miranda issues and then clarified with him whether he wanted to talk at this point or sometime later, and then he continued to talk. And when he was ready, he talked about the details. Under the totality of the circumstances, Your Honors are correct, and I appreciate from the statements and the questioning the amount of deference that you give to the state court's determination under AEDPA. Well, we do get occasional reminders from the Supreme Court that we're not giving quite as much deference as we're supposed to. That's correct. And this panel, from the questions, appears to fully appreciate that deference though, under AEDPA, and under the facts of this case, it's not an objectively unreasonable determination. Just briefly on the issue of prejudice, when the trial court instructed the jury and commented on the evidence, it did not specifically refer to the defendant's videotaped statement. He did refer to the fact that the defendant had stated himself that he put his hand over her mouth and nose and stopped her breathing. Those statements by the defendant were made to three separate witnesses. Trudy Levy testified that the defendant told her he put his hand over her mouth and nose and stopped her breathing. The defendant's brother, John Wenzel, testified that he was told that he put his hands over her mouth and nose and stopped her breathing. And then thirdly, his wife at the time, Nancy Rem, testified that he put his hand over her mouth and nose and kept it there for 30 to 45 minutes. So there was overwhelming evidence on not only that the defendant had stopped his wife's breathing in his note, but also the way he did it, by placing his hand over her mouth and nose and smothering her. That, combined with the physical evidence, made an inescapable conclusion that the defendant actually smothered his wife to death. The pathologist's findings found that the petechial hemorrhages showed an effort to breathe by Lynn Wenzel, and the defendant overcame that by placing his hand over her mouth and nose and smothering her to death. So it's difficult to imagine a more cumulative confession than the videotape statement in this case. If there are no other questions, we'll record. What's your response to Mr. Savilla's argument that there were statements that were made in the video after Mr. Wenzel invoked that go to the malice issue? What was different about what he said to the police and what he said to the other three witnesses, plus this corroborating evidence? There was nothing particularly damaging about his statements. He did expound on the suicide pact that they had together, and he talked a lot about the conversation they had at dinner that night, and she asked him, are you strong enough? But he recounted all that to the witnesses, didn't he? To a certain extent. If anything, those additional statements tended to help him and provide some basis for a defense, although it was not a legitimate defense. Right, exactly. And he basically summarized those circumstances to the other witnesses. And the trial court, or excuse me, the court of appeal did find that those statements were substantially similar to his videotape statement. Are there any other questions? Mr. Savilla, I'll give you a minute in rebuttal if you'd like, since your opponent didn't use up all his time. One of the contentions on the prejudice issue was that appellant's brother, John Wenzel, in a shorthand version, reiterated the same confession. Actually, what he said was, I'm not sure whether I got that information from the agents or from my brother. I read that, but I guess the question I'm struggling with is what was different, what was so significant in what he said to the police that was different from what he said in substance to the three? Well, as Mr. Ragland indicated, there was much more detail in the videotape, particularly about the suicide pact, which would give those jurors who wanted to say, well, this was an intentional, unmitigated homicide because of their preexisting agreement and that he went forth and acted on it, whereas the note really doesn't make that point. But he did say the same thing to the witnesses, didn't he? I think the only similarity was... They talked at dinner. She asked them, are you strong enough to do it? I mean, that all goes to a suicide pact. It goes to it, but it certainly doesn't fill in the detail. And I think like in Fulminetti, where they said a confession that does fill in the details to provide the motivation tends toward prejudice. Well, thank you very much. Thank you very much. Counsel, the case just argued is submitted and we are adjourned.
judges: Goodwin, Beezer, Tallman